# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DISTRICT

VARILEASE FINANCE, INC.,
and VFI KR SPE I LLC,

     Plaintiffs,

v.

INTERCONTINENTAL
CAPITAL GROUP, INC., and
DUSTIN A. DIMISA,

     Defendants.

Case No.  22-cv-12875

Hon. Bernard A. Friedman

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' VERIFIED MOTION FOR POSSESSION OF EQUIPMENT AND COLLATERAL

i

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES .................................................................... iv

ISSUE PRESENTED .............................................................................. vi

MOST APPROPRIATE AUTHORITIES .............................................. vii

    I.      INTRODUCTION ..................................................................1

    II.     STATEMENT OF FACTS .....................................................3

          **A.**    **Background on ICG and Plaintiffs.** ...........................3

          **B.**    **Plaintiffs' first and second loans to ICG.** ................4

          **C.**    **Plaintiffs improperly file another all-asset UCC financing statement shortly after agreeing to terminate, and terminating, the last one.** ..........................................5

          **D.**    **Plaintiffs offer ICG a third loan and agree not to assert an all-asset lien to secure it.** ..........................................6

          **E.**    **ICG's business suffers severe decline, and ICG seeks alternative funding** ...............................................9

          **F.**    **ICG's current financial picture.** .............................10

          **G.**    **Plaintiffs' damage claims are overstated, and Plaintiffs' false assertion of an all-asset lien now risks causing further damage to Defendants.** .........................11

    III.    ARGUMENT ........................................................................12

          **A.**    **Plaintiffs disclaimed an all-asset lien as to Loan #3** ............13

**B.     Even if Plaintiffs have an all-asset UCC lien, Plaintiffs have not demonstrated that it attaches to the ERC** .....................15

**C.     Even if Plaintiffs have a security interest in the ERC, Plaintiffs have not demonstrated entitlement to relief.** ........19

IV.   CONCLUSION ....................................................................20

CERTIFICATE OF SERVICE .............................................................. viii

INDEX OF EXHIBITS .............................................................ix

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## Cases

*Adler v. Fenton*,
   65 U.S. 407, 24 How. 407, 16 L.Ed. 696 (1861)..................................................12

*Bishop v. Gosiger, Inc.*,
   692 F. Supp. 2d 762 (E.D. Mich. 2010)...............................................................14

*Essroc Cement Corp. v. CPRIN, Inc.*,
   593 F. Supp. 2d 962 (W.D. Mich. 2008) ............................................................12

*Grand Pointe Prop., L.L.C. v. SEC Grand Pointe, L.L.C.*,
   No. 301293, 2013 WL 195527 (Mich. Ct. App. Jan. 17, 2013) ..........................14

*Grupo Mexicano*,
   527 U.S. 308, 119 S.Ct. 1961 .............................................................................12

*In re Taylored Products, Inc.*,
   1968 WL 9184 (Bankr. W.D. Mich. 1968)..........................................................16

*Klapp v. United Ins. Grp. Agency, Inc.*,
   468 Mich. 459, 663 N.W.2d 447 (2003)..............................................................18

*Mich Tractor & Machinery Co v. Jocham Excavating, Inc*,
   216 Mich. App 94; 98; 549 NW2d 27 (1996) .....................................................16

*Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*,
   469 Mich. 362, 666 N.W.2d 251 (2003)..............................................................14

*RBS Asset Finance, Inc. v. Bravo*,
   2005 WL 3008581 (E.D.Mich. Nov. 9, 2005)....................................................12

*Yatooma v. Barker*,
   No. 294932, 2010 WL 5373807 (Mich. Ct. App. Dec. 28, 2010)............... 17, 18

## Statutes

MCL § 440.9109 ...................................................................................................15

MCL § 440.9109(3)(a) ..........................................................................................15

MCL § 440.9109(4)(m) ............................................................................15

**Rules**

MCR 3.105(E)(3)(b)(i)..............................................................................19

MCR 3.105(E)(3)(b)(ii) ............................................................................19

Michigan Court Rule 3.105(E) ......................................................... 13, 19

## ISSUE PRESENTED

Should the Court grant Plaintiffs' motion where the "equipment" portion of their motion is moot, and where Plaintiffs have not demonstrated that their claim of lien on a Federal Employee Retention Credit is "probably valid" or that they are otherwise entitled to any injunctive relief.

Defendants Answer:      No.

## <u>MOST APPROPRIATE AUTHORITIES</u>

*Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962 (W.D. Mich. 2008)

*In re Taylored Products, Inc.*, 1968 WL 9184 (Bankr. W.D. Mich. 1968)

*Yatooma v. Barker*, No. 294932, 2010 WL 5373807 (Mich. Ct. App. Dec. 28, 2010)

*Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362; 666 N.W.2d 251 (2003)

*Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459; 663 N.W.2d 447 (2003)

MCL § 440.9109

MCR 3.105(E)

## I.      INTRODUCTION

Defendants Intercontinental Capital Group, Inc. ("ICG") and Dustin DiMisa respectfully request that the Court deny Plaintiffs' motion. Defendants do not contest that Plaintiffs have a valid security interest in the "equipment" at issue.[1] But Defendants have already been actively cooperating with Plaintiffs to return the equipment for weeks now. On February 16, 2023, ICG completed its return of all of the smaller items still in ICG's possession or control to Plaintiffs' designated facility in New York. The parties further agreed that larger items, such as furniture, which are in an ICG storage facility in North Carolina, should remain there while Plaintiffs try to sell them directly from that location, rather than incurring costs to move and re-store them for sale from a different location. Defendants have agreed to provide Plaintiffs access to ICG's storage facility and have even assisted Plaintiffs in trying to locate potential interested third-party buyers for the items in North Carolina.

Thus, as to the equipment portion of Plaintiffs' motion, the motion is moot and should be denied on that basis alone. Plaintiffs have not demonstrated any need for the Court to take the extreme measure of ordering injunctive relief requiring Defendants to do with the equipment what they have already done and will continue to do.

---

[1] The "equipment" is set forth in the exhibit to Plaintiffs' Complaint entitled "Schedule NO. 03", at ECF No. 1 at PageID 112-171. It consists largely of miscellaneous IT equipment, accessories, and office furniture.

1

The remainder of Plaintiffs' motion should also be denied. Plaintiffs have failed to demonstrate that their purported security interest in the other "collateral" of which they seek possession – the Federal Employee Retention Credit (the "ERC")[2] – is "probably valid." To the contrary, for the reasons detailed in Section III, *infra*, Plaintiffs do <u>not</u> have a security interest in the ERC, and they are not otherwise entitled to either "possess" or "freeze" the ERC or any other assets of ICG.

In addition, there are non-parties to this case, including another lender owed at least $28 million by ICG that also claims to have a security interest in the ERC, and others that have at least as much interest in the ERC as Plaintiffs do. Plaintiffs have not bothered to join them as necessary parties (even though Plaintiffs are well aware of their identities and their claims to the ERC). Rather, through this motion, Plaintiffs appear to be attempting to use this Court to improperly take or freeze all of ICG's remaining assets in order to do an end-run around other ICG creditors. As further detailed below, the Court should deny the motion.

---

[2] The ERC is a refundable tax credit for businesses that continued to pay employees while shut down due to the COVID-19 pandemic or had significant declines in gross receipts from March 13, 2020 to Dec. 31, 2021. Eligible employers may claim the ERC on an original or adjusted employment tax return for a period within those dates. *See* https://www.irs.gov/coronavirus/employee-retention-credit. The ERC program was created as part of the CARES ACT enacted on March 27, 2020.

2

## II.    STATEMENT OF FACTS

The facts set forth below are supported by the Declarations of ICG's CEO, Dustin DiMisa, and its CFO, Howard Stein, attached as **Exhibit A** and **Exhibit B**, respectively, as well as the State of New York UCC lien list summary attached as **Exhibit C**, and the pleadings on file with the Court.

Defendants also respectfully request a reasonable opportunity to present further evidence, and to examine Plaintiffs' witnesses in open court, before the Court rules on the motion, if the Court is inclined to rule in Plaintiffs' favor.

### A.    Background on ICG and Plaintiffs.

ICG is a direct mortgage lender based in New York that, until recently, had operations around the country. At its peak, ICG employed nearly 1,900 employees. Today it has six remaining employees, including Mr. DiMisa and Mr. Stein.

In mid-2018, ICG was contacted by a representative of Plaintiffs and offered financing structured as an equipment "sale-leaseback." In other words, ICG would purport to "sell" certain office furniture and equipment that it already owned, or was already in the process of buying, to Plaintiffs who would then purport to "lease" it back to ICG for a period of time. The monthly "rental" payments were essentially calculated as amortized repayments of a high interest loan.

ICG had had no prior dealings with Plaintiffs but agreed to try them out with an initial loan. To that end, on or about June 18, 2018, ICG and Plaintiffs executed

a "Master Lease Agreement" (the "MLA", which together with the related "sale-leaseback" and other documents related to the initial loan, is attached to Plaintiffs' Complaint, ECF No. 1 at PageID 22-93). Buried within Section 2(b) of the MLA (a section entitled "TERM"), is a one-sentence security agreement that purported to grant Plaintiffs a security interest not just in any equipment subject to the sale-leaseback, but also in all assets in which ICG "has an interest." Notably, the security agreement does <u>not</u> include an after-acquired property clause (the standard commercial form of which would state that a security agreement covers all assets "whether now existing or hereafter arising or acquired").[3]

## B. Plaintiffs' first and second loans to ICG.

On or about July 16, 2018, ICG and Plaintiffs closed on their first loan pursuant to the MLA for $1,000,000 (hereafter referred to as "Loan #1). On the same date, Plaintiffs also recorded a UCC financing statement against ICG with the New York Secretary of State reflecting an all-asset lien. However, ICG's assertion of an all-asset lien caused ICG difficulty with its other lenders, and, at ICG's request, the Plaintiffs terminated that filing a year later on July 18, 2019.

Importantly, at the time Plaintiffs terminated the all-asset filing, Plaintiffs still claimed an outstanding balance owed on Loan #1. Loan #1 has since then been re-paid in full.

---

[3] The importance of this omission is discussed further in Section III(B), *infra*.

On or about August 13, 2019, ICG and Plaintiffs closed on a second loan for $1,000,000 (hereafter referred to as Loan #2). Plaintiffs again, on the same date, recorded a new UCC financing statement against ICG reflecting an all-asset lien. And again, at ICG's request, the Plaintiffs terminated that filing eight months later on April 20, 2020. Again, at the time Plaintiffs terminated the all-asset filing for Loan #2, Plaintiffs still claimed an outstanding balance owed on Loan #2.  Loan #2 has since then also been re-paid in full.[4]

### C.   Plaintiffs improperly file another all-asset UCC financing statement shortly after agreeing to terminate, and terminating, the last one.

On May 14, 2020, less than one month after terminating their all-asset financing statement, unbeknownst to Defendants and without Defendant's permission, and although ICG was not then in the process of seeking a new loan from Plaintiffs, Plaintiffs improperly filed yet another UCC financing statement against ICG again purporting to record an all-asset lien.

This appears to have been a simple filing error by Plaintiffs because Plaintiffs were, at that time, in the process of closing a separate loan, under an agreement entirely separate from the MLA, to a corporate affiliate of ICG. Plaintiffs tried to

---

[4] Plaintiffs concede that Loans #1 and #2 are fully paid. *See* ECF 1, PageID 217, fn. 1 (Plaintiffs state: "The obligations under Schedules No. 01 and No. 02 were fully satisfied.")

correct their error by filing another all-asset UCC financing statement against that separate affiliate on June 8, 2020.[5]

**D.     Plaintiffs offer ICG a third loan and agree <u>not</u> to assert an all-asset lien to secure it.**

Approximately one year later, in or around April of 2021, Plaintiffs and ICG began discussing a third loan to ICG, this time for $5 million. However, Mr. DiMisa reminded Plaintiffs that their prior filing of an all-asset UCC financing statement against ICG in connection with Loan #1 and Loan #2 had impeded ICG's ability to obtain financing from other lenders, which is why ICG had asked Plaintiffs to terminate those filings (which Plaintiffs agreeably terminated).

Mr. DiMisa informed Plaintiffs that ICG was unwilling to enter into a new loan with Plaintiffs unless Plaintiffs agreed not to assert an all-asset lien in relation to that loan. In response, Plaintiffs verbally promised both Mr. DiMisa and Mr. Stein that Plaintiffs would not assert an all-asset lien in connection with the new loan.  Mr. DiMisa stated that he wanted "something in writing" to that effect before he closed.

In response, on May 7, 2021, Plaintiffs' Senior Vice President, Matthew Korte, sent the following confirmatory email to Mr. DiMisa and Mr. Stein:

---

[5] ICG's affiliate repaid that loan in full in or around May of 2022, and Plaintiffs terminated the financing statement against that affiliate on August 22, 2022.

**From:** Matthew Korte <mkorte@vfi.net>
**Sent:** Friday, May 7, 2021 12:22 PM
**To:** Dustin DiMisa <ddimisa@icghome.com>; Howard Stein <hstein@icghome.com>
**Subject:** UCC Filing - VFI

Dustin-

This email is to confirm our conversation today that we will not be filing a blanket UCC on this transaction and will have no filings until we are approved and funded on this schedule. As discussed with both you and Howard I will also work to amend the Master Lease Agreement to remove the blanket language so no future filings become an issue.

I hope you both have a great day and a great weekend!

And to Dustin, happy belated birthday!



--

**Matthew Korte**
Senior Vice President - Business Development

**O:** 801.733.8100 | **D:** 801.438.0741 | **W:** www.vfi.net
**A:** 2800 E Cottonwood Pkwy, 2nd Floor | Salt Lake City, UT 84121

Simple. Direct. Investment Grade.
VFI is a Bank Backed, Investment-Grade Rated Commercial Finance Lender.

In reliance on Plaintiffs' verbal promises and Mr. Korte's confirmatory email, ICG moved forward to closing, and closed, a third loan with Plaintiffs in the amount of $5 million ("Loan #3) on or about June 7, 2021.

On the same date, consistent with Plaintiffs' agreement, Plaintiffs filed only an "asset-specific" UCC financing statement against ICG, which was expressly limited to claiming a lien only on the "equipment" in Schedule No. 03. Unlike with Loan #1 and Loan #2, Plaintiffs did not file an all-asset financing statement in connection with the closing of Loan #3. Plaintiffs filing of the asset-specific UCC financing statement on June 7, 2021 makes no sense if Plaintiffs believed they already had, or were taking, a lien on all of ICG's assets in connection with Loan #3.

Plaintiffs' motion is tellingly vague on these points. Plaintiffs do not deny Mr. Korte's email, and do not plausibly contradict the general logic of the series of events as described above. Plaintiffs simply state, without providing evidence, that at some point between Mr. Korte's email and the closing on Loan #3, Plaintiffs' "loan committee" reneged on Mr. Korte's representations to Mr. DiMisa and Mr. Stein and then "communicated this verbally to Defendants." Plaintiffs' Brief at p. 2. Plaintiffs do not state what date this alleged verbal communication occurred, who communicated to whom, or what specifically was communicated. Plaintiffs fail to provide an affidavit or any other admissible evidence from whomever of Plaintiffs'

representatives purports to have made this call to ICG. Mr. DiMisa and Mr. Stein deny ever receiving such a call.

### E. ICG's business suffers severe decline, and ICG seeks alternative funding from a new lender.

In 2020 and 2021, ICG's business began to experience severe financial strain due to the effects of the COVID-19 pandemic on its business, and ICG began looking for additional sources of funding to continue to retain employees and save its operations.

In November of 2021, ICG started the process of applying for a Federal Employee Retention Credit (the "ERC"), which ICG believed at the time would take the IRS four to six months to process and would result in a cash payment to ICG of $34 million or more.

At the same time, ICG was approached by a new lender, FCS Advisors, LLC d/b/a Brevet Capital Advisors ("Brevet"), which offered to provide ICG a $25 million loan using the ERC as collateral. In reliance on Plaintiffs' prior representations that they were not asserting an all-asset lien as to Loan #3, on or about December 20, 2021, ICG entered into a loan agreement with Brevet in which ICG specifically pledged the ERC to Brevet as collateral for an initial $25 million loan (the "Brevet Loan").

As part of the Brevet Loan, Brevet established a "lockbox" account for receipt of any ERC distribution and filed special forms with the IRS directing the IRS to

9

pay any ERC funds directly to Brevet's lockbox instead of to ICG. In addition, on January 18, 2022, Brevet also filed a UCC financing statement in New York expressly referencing the ERC.

ICG spent the proceeds of the Brevet Loan largely attempting to retain employees, but also to timely pay ICG's other creditors, including Plaintiffs themselves, in order to try to salvage its business.

### F.    ICG's current financial picture.

Unfortunately, ICG has so far been unable to turn around its dire financial situation, and is now, as mentioned above, down to six remaining employees and in a substantial amount of debt.  In addition to Brevet, which is currently owed at least $28 million (and claims to be owed significantly more), ICG owes millions of dollars to other creditors.

By way of example, ICG currently owes a substantial settlement sum to a plaintiff class of former employees that filed suit against ICG in the United States District Court for the Eastern District of Virginia, Case No. 3:22-cv-00034-JDN, and which is holding a confession of judgment against ICG for more than $2 million. Those plaintiffs, rightly or wrongly, are also expecting to be paid from ERC funds, if and when the ERC funds are ever paid out by the IRS.

Unfortunately, ICG woefully underestimated the length and complexity of the ERC application process. As of today's date, the ERC still remains in the application

process and under "examination" by the IRS.  At the rate things are progressing with the IRS, ICG estimates it will likely take at least another 9 to 12 months of ICG's continued cooperation with the IRS "examination" process before the IRS makes any decision on whether to fund the ERC and, if so, in what amount.

ICG presumes that if and when the IRS makes any payments, they will be made directly to Brevet's lockbox pursuant to the forms Brevet filed with the IRS, and not to ICG.  But in the event any ERC payments are received directly by ICG, the Brevet Loan agreement specifically requires ICG to remit such payments to Brevet within three business days of ICG's receipt.

> ### G.   Plaintiffs' damage claims are overstated, and Plaintiffs' false assertion of an all-asset lien now risks causing further damage to Defendants.

As stated above, ICG has fully re-paid Loan #1 and Loan #2, with interest. Before ICG became financially unable to continue making the monthly "rental" payments on Loan #3, it also made repayments to Plaintiffs on Loan #3 totaling more than $2.5 million.

In spite of that, Plaintiffs currently claim to be entitled to an additional $5.2 million of payments from ICG (or from Mr. DiMisa as personal guarantor) on an original $5 million loan.  Plaintiffs further assert that they are entitled to this amount (or only slightly less than that) regardless of whether or not ICG returns the "leased"

equipment, because Plaintiffs claim to be entitled to "stipulated loss value" of $4.5 million for the equipment.

As set forth in Defendants' Answer and Affirmative Defenses (ECF No. 10), Defendants contest Plaintiffs' claims, and in particular Plaintiffs' calculation of damages and their assertion of an all-asset lien. Moreover, in the event Plaintiffs succeed in interfering with ICG's ability to come to terms with either Brevet or ICG's other creditors through Plaintiffs' continued false assertion of an all-asset lien, Plaintiffs also intend to seek leave to amend to assert counterclaims against Plaintiffs for such conduct.

## III.   ARGUMENT

It is well established that a Federal court has no authority to freeze or sequester a civil defendant's assets, <u>pre-judgment</u>, at the request of an ordinary unsecured creditor, absent special circumstances or statutory authority not present here.[6] Plaintiffs ignore this body of case law because they purport to have a security interest in the ERC. Moreover, Plaintiffs argue that they meet the burden of showing an

---

[6] *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 971 (W.D. Mich. 2008) ("In essence, Essroc 'is asking this Court to ignore over 200 years of American jurisprudence prohibiting the equitable relief of freezing a party's 'unencumbered assets ... before their claims have been vindicated by judgment.' *RBS Asset Finance, Inc. v. Bravo*, 2005 WL 3008581, *2 (E.D.Mich. Nov. 9, 2005) (citing *Adler v. Fenton*, 65 U.S. 407, 24 How. 407, 16 L.Ed. 696 (1861), and *Grupo Mexicano*, 527 U.S. 308, 119 S.Ct. 1961). This the court will not do.")

entitlement to "possession" or a "freeze" of the ERC pending final judgment as laid out in Michigan Court Rule 3.105(E). Plaintiffs, however, are incorrect on both points.

### A.   Plaintiffs disclaimed an all-asset lien as to Loan #3.

As detailed above, Loan #3 is the only outstanding loan between Plaintiffs and ICG. On May 7, 2021, Plaintiffs disclaimed an all-asset lien as to Loan #3. They did this via verbal promises and a confirmatory email to ICG, which were consistent with their subsequent actions; namely, filing only an asset-specific UCC Financing Statement against ICG in conjunction with the closing of Loan #3.

As previously stated, Plaintiffs do not deny Mr. Korte's email. Plaintiffs simply state, without providing evidence, that at some point between Mr. Korte's email and the closing on Loan #3, Plaintiffs' "loan committee" reneged on Mr. Korte's representations to Mr. DiMisa and Mr. Stein and then "communicated this verbally to Defendants." Plaintiffs' Brief at p. 2. Plaintiffs do not state what date this alleged verbal communication occurred, who communicated to whom, or what specifically was communicated. Plaintiffs fail to provide an affidavit or any other admissible evidence from whomever of Plaintiffs' representatives purports to have made this call to ICG. And Mr. DiMisa and Mr. Stein deny ever receiving such a

call. Accordingly, Plaintiffs have not provided sufficient evidence to establish that they have an all-asset lien on ICG's assets.[7]

Plaintiffs instead attempt to argue that because the MLA, which ICG signed in June of 2018, includes what Plaintiffs purport to be a "merger" or "integration clause," none of the above is relevant. Plaintiffs' argument should be rejected. Plaintiffs' agreement not to assert an all-asset lien as to Loan #3 occurred in May of 2021. Michigan law is clear that an integration clause in a contract does not bar parol evidence either of representations made *after* the contract was signed, nor does it bar parol evidence of two parties' subsequent agreement to modify their original agreement, whether that subsequent agreement is entirely verbal or in writing.[8] Plaintiffs and ICG did just that on May 7, 2021.

---

[7] In addition, Defendants have also asserted affirmative defenses to Plaintiffs' all-asset lien claim, including an estoppel defense based on Plaintiffs' May 7, 2021 representations, and Defendants' reliance on those representations in closing the Brevet Loan. *See* Defendants' Affirmative Defenses, ECF 10, PageID 262. The merits of these defenses cannot be fully adjudicated in the context of Plaintiffs' motion on one week's notice and without the benefit of any discovery.

[8] *See Grand Pointe Prop., L.L.C. v. SEC Grand Pointe, L.L.C.*, No. 301293, 2013 WL 195527, at *8 (Mich. Ct. App. Jan. 17, 2013) ("[T]he merger clause simply did not apply to these post-contractual statements."); *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 773 (E.D. Mich. 2010) ("Even if the contract is read to require written notice of any modification to Schedule B, and even if the June 14, 2007 email did not serve as that notification, the parties may have waived this requirement. It is generally accepted that a "no-oral-modification" provision can be waived by the parties through subsequent oral agreement or passive approval."); *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 364–65, 666 N.W.2d 251, 253–54 (2003) ("[P]arties to a contract are free to *mutually* waive or modify their

**B.** **Even if Plaintiffs have an all-asset UCC lien, Plaintiffs have not demonstrated that it attaches to the ERC**.

Plaintiffs have failed to cite any authority, and Defendants are not aware of any, to support the core proposition that is simply assumed by Plaintiffs' motion; namely, that a state-law Article 9 security agreement and UCC filing is sufficient to perfect a security interest in a Federal ERC.

The MLA, per Section 19(a), is governed by Michigan law. MCL § 440.9109, which sets forth the scope of Michigan's Article 9 transactions, does not expressly include federal tax credits as a type of collateral within the scope of Article 9, and MCL § 440.9109(4)(m) specifically excludes from the scope of Article 9 "[a] transfer by a governmental subdivision or agency." Additionally, MCL § 440.9109(3)(a) provides that Article 9 does not apply to the extent preempted by "a statute, regulation or treaty of the United States." ERCs are a relatively new creation of the IRS (less than three years old), and it is far from clear that the one-sentence security agreement buried in the MLA – even if Plaintiffs never disclaimed it – is even sufficient to create a security interest in an ERC.

---

contract notwithstanding a written modification or anti-waiver clause because of the freedom to contract…. This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract.")

15

As importantly, the MLA, which ICG executed in June of 2018, purports to grant Plaintiffs a security interest in all assets in which ICG "has an interest" and does <u>not</u> include an after-acquired property clause (the standard commercial form of which would state that a security agreement covers all assets "whether now existing or hereafter arising or acquired").  Any right ICG may now have in the ERC did not exist in June 2018. Indeed, the ERC program itself was not even enacted by Congress until March 27, 2020.

In *In re Taylored Products, Inc.*, 1968 WL 9184 (Bankr. W.D. Mich. 1968), a federal bankruptcy court, interpreting and applying Michigan law,[9] held that under Michigan law a security agreement which fails to include a clear after-acquired property clause is ineffective to grant any security interest whatsoever in property that the borrower acquires after the date of the security agreement.  1968 WL 9184 at *289-290. The court further noted that "Michigan attorneys ha[ve] been warned of the necessity of including an 'after acquired property clause' in security agreements." *Id.* at *291.

Since *Taylored Products* was decided, at least two Michigan Court of Appeals panels have had the opportunity to consider its holding, and neither has held that its interpretation of Michigan law is incorrect.  *See Mich Tractor & Machinery Co v.*

---

[9] The court was interpreting an earlier version of Michigan's UCC, but the language relied on by the court has not materially changed in the current version.

*Jocham Excavating, Inc,* 216 Mich. App 94; 98; 549 NW2d 27 (1996); *Yatooma v. Barker*, No. 294932, 2010 WL 5373807 (Mich. Ct. App. Dec. 28, 2010); *see also* 8A Part II Anderson U.C.C. § 9-204:9 (3d. ed.) ("In the absence of an after-acquired property clause, the security interest extends only to the collateral described in the security agreement as being the collateral at the time the agreement is made.")[10]

The *Yatooma* case is instructive.  In that case, the plaintiff, a secured creditor, claimed that it held a security interest in a certain right of first refusal which its borrower had obtained after entering into a security agreement with the plaintiff. The security agreement did not include an after-acquired property clause. The plaintiff argued, however, that because the agreement referred to "*all* of the assets and *all* of the personal property of the borrower," it must be reasonably read to attach to the right of first refusal. The trial court denied the defendant's motion for summary

[10] There are some cases interpreting the law of other states which hold that an after-acquired property clause is not necessarily essential to granting a security interest in after-acquired property.  These cases generally involve grants of security in accounts receivable and/or inventory. Such cases take a more liberal view of what language is required in a security agreement and argue that it is not commercially reasonable to interpret those specific types of collateral as limited solely to what was on hand at the time the security agreement was signed, since those types of collateral, by their nature, turn over constantly.  But the ERC is not inventory or an account receivable. If it fits within any UCC collateral definition at all, it is most likely as a "general intangible."  Defendants are unaware of any cases applying the more lenient view of the UCC's drafting requirements to a general intangible.

17

disposition, finding that the absence of an after-acquired property clause created a genuine issue of material fact as to whether the security interest attached to the right.

On appeal, the Michigan Court of Appeals reversed and remanded for entry of summary disposition in favor of the defendant, holding that in the absence of an after-acquired property clause and in light of the fact that a right of first refusal is not the type of asset that by its nature would be expected to be be in constant flux (such as inventory or receivables), it was clear as a matter of law that the plaintiff's security interest did <u>not</u> attach to the right.  2010 WL 5373807, at *3-4.

Here, Plaintiffs are sophisticated commercial lenders that drafted the MLA and determined that it would be governed by Michigan law. Plaintiffs could have easily heeded the warning of *Taylored Products* and *Yatooma* and included an after-acquired property clause in their security agreement, but they did not.  Moreover, to the extent that by failing to do so Plaintiffs created any ambiguity about the reach of their own security agreement, Michigan law requires that this ambiguity be construed against them.[11] Accordingly, for these additional reasons, Plaintiffs do <u>not</u> have a security interest in the ERC.

---

[11] *See Klapp v. United Ins. Grp. Agency, Inc.*, 468 Mich. 459, 470, 663 N.W.2d 447, 454 (2003) ("In interpreting a contract whose language is ambiguous, the jury should also consider that ambiguities are to be construed against the drafter of the contract.") (describing the rule of *contra proferentum* as a "tie-breaker").

**C.    Even if Plaintiffs have a security interest in the ERC, Plaintiffs have not demonstrated entitlement to relief.**

Michigan Court Rule 3.105(E), on which Plaintiffs rely, requires Plaintiffs to demonstrate, first and foremost, that their entitlement to the ERC is "probably valid." *See* MCR 3.105(E)(3)(b)(i). For all of the reasons stated above, Plaintiffs have failed to demonstrate that. Moreover, Plaintiffs are not, and in their motion do not claim to be, the only creditor with a possible lien on the ERC.  Nor do Plaintiffs even argue, let alone provide any proof, that their purported security is senior to all other secured creditors of ICG.  Plaintiffs also do not explain why they have not joined Brevet and the other lien claimants to this lawsuit, as necessary parties, before filing their motion.

In addition, Michigan Court Rule 3.105(E) requires Plaintiffs to demonstrate that ICG "will damage, destroy, conceal, dispose of, or use so as to substantially impair" the ERC's value before trial if the relief Plaintiffs' seek is not granted. MCR 3.105(E)(3)(b)(ii). Plaintiffs have provided no evidence of this at all. Instead, Plaintiffs simply argue that because the ERC involves money, and money is easy to dissipate, Plaintiffs are entitled to injunctive relief against ICG. But ICG does not even have any ERC funds, any such funding is likely 9 to 12 months away, and such funds are expected to be paid by the IRS directly to Brevet (if and when the IRS ever issues any payment). In short, Plaintiffs have not demonstrated their entitlement to relief under the Michigan Court Rules either.

19

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court

deny Plaintiffs' motion.

Respectfully submitted,

Dated: February 17, 2023

*/s/ Doron Yitzchaki*
Doron Yitzchaki (P72044)
Robert L. Avers (P75396)
Dickinson Wright PLLC
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
(734) 623-1947
dyitzchaki@dickinsonwright.com
ravers@dickinsonwright.com
*Attorneys for Defendants*

20

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 17, 2023, I electronically filed the foregoing

documents and all exhibits with the Court's electronic filing system, which will send

electronic notification of such filing to counsel of record.

*/s/ Doron Yitzchaki*
Doron Yitzchaki (P72044)

## <u>INDEX OF EXHIBITS</u>

| Exhibit No. | Description |
|:---:|:---|
| A | Declaration of Dustin DiMisa |
| B | Declaration of Howard Stein |
| C | State of New York UCC Lien Summary For Intercontinental Capital Group, Inc. |

4858-6998-4593 v2 [104461-1]

ix