# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DISTRICT

VARILEASE FINANCE, INC.,
and VFI KR SPE I LLC,

Case No. 22-cv-12875

    Plaintiffs,

Hon. Bernard A. Friedman

v.

INTERCONTINENTAL
CAPITAL GROUP, INC., and
DUSTIN A. DIMISA,

    Defendants.

---

## DECLARATION OF DUSTIN DIMISA

I, Dustin A. DiMisa, make this declaration under 28 U.S.C. § 1746:

1.    Intercontinental Capital Group, Inc. ("ICG") is a direct mortgage lender based in New York that, until recently, had operations around the country. At its peak, ICG employed nearly 1,900 employees. Today it has six remaining employees, including myself and Howard Stein.

2.    I am the CEO of ICG and have been CEO since 2008.

3.    Mr. Stein is the CFO of ICG and has been CFO since 2015.

4.    In mid-2018, ICG was contacted by a representative of Plaintiffs and offered an equipment sale and leaseback.

5.      ICG had had no prior dealings with Plaintiffs but agreed to try them out.

6.      To that end, on or about June 18, 2018, ICG and Plaintiffs executed a "Master Lease Agreement" (the "MLA").

7.      On or about July 16, 2018, ICG and Plaintiffs closed on their first loan pursuant to the MLA for $1,000,000 (hereafter referred to as "Loan #1). On the same date, Plaintiffs also recorded a UCC financing statement against ICG with the New York Secretary of State reflecting an all-asset lien. However, ICG's assertion of an all-asset lien caused ICG difficulty with its other lenders, and, at ICG's request, the Plaintiffs terminated that filing a year later on July 18, 2019.

8.      At the time Plaintiffs terminated the all-asset filing, Plaintiffs still claimed an outstanding balance owed on Loan #1. Loan #1 has since then been re-paid in full.

9.      On or about August 13, 2019, ICG and Plaintiffs closed on a second loan for $1,000,000 (hereafter referred to as "Loan #2"). Plaintiffs again, on the same date, recorded a new UCC financing statement against ICG with the New York Secretary of State reflecting an all-asset lien. And again, at ICG's request, the Plaintiffs terminated that filing eight months later on April 20, 2020.

2

10.    Again, at the time Plaintiffs terminated the all-asset filing for Loan #2, Plaintiffs still claimed an outstanding balance owed on Loan #2.  Loan #2 has since then also been re-paid in full.

11.    Less than one month later, on or about May 14, 2020, unbeknownst to ICG and without permission, and although ICG was not then in the process of seeking a new loan from Plaintiffs, Plaintiffs improperly filed yet another UCC financing statement against ICG again reflecting an all-asset lien.[1]

12.    A year later, in or around early May of 2021, Plaintiffs and ICG began discussing a third loan to ICG, this time for $5,000,000. However, I reminded Plaintiffs that their prior filing of an all-asset UCC financing statement against ICG in connection with Loan #1 and Loan #2 had impeded ICG's ability to obtain financing from other lenders, which is why ICG had asked Plaintiffs to terminate those filings (which Plaintiffs agreeably had).

13.    I also informed Plaintiffs that ICG was unwilling to enter into a new loan with Plaintiffs unless Plaintiffs first agreed not to assert an all-asset lien in relation to that loan. In response, Plaintiffs verbally promised me and Mr. Stein that Plaintiffs would not assert an all-asset lien in connection with the new loan.  I stated

---

[1] This may have been a filing error by Plaintiffs because Plaintiffs were, at that time, in the process of closing a separate loan, under an agreement entirely separate from the MLA, to a corporate affiliate of ICG.  Plaintiffs tried to correct their error by filing another all-asset UCC financing statement against that affiliate on June 8, 2020.  That affiliate repaid its loan in full in or around May of 2022, and Plaintiffs filed a termination of the financing statement against the affiliate on August 22, 2022.

3

I wanted "something in writing" to that effect before I closed. In response, on May

7, 2021, Plaintiffs' Senior Vice President, Matthew Korte, sent the following

confirmatory email to me and Mr. Stein:

**From:** Matthew Korte <mkorte@vfi.net>
**Sent:** Friday, May 7, 2021 12:22 PM
**To:** Dustin DiMisa <ddimisa@icghome.com>; Howard Stein <hstein@icghome.com>
**Subject:** UCC Filing - VFI

Dustin-

This email is to confirm our conversation today that we will not be filing a blanket UCC
on this transaction and will have no filings until we are approved and funded on this
schedule. As discussed with both you and Howard I will also work to amend the Master
Lease Agreement to remove the blanket language so no future filings become an issue.

I hope you both have a great day and a great weekend!

And to Dustin, happy belated birthday!



--

Matthew Korte
Senior Vice President - Business Development

O: 801.733.8100 | D: 801.438.0741 | W: www.vfi.net
A: 2800 E Cottonwood Pkwy, 2nd Floor | Salt Lake City, UT 84121

Simple. Direct. Investment Grade.
VFI is a Bank Backed, Investment-Grade Rated Commercial Finance Lender.

4

14. In reliance on Plaintiffs' verbal promises and Mr. Korte's confirmatory email, ICG moved forward to closing, and closed, the third loan in the amount of $5 million (hereafter referred to as "Loan #3) with Plaintiffs on or about June 7, 2021.

15. On June 7, 2021, consistent with Plaintiffs' verbal promises and Mr. Korte's confirmatory email, Plaintiffs filed only an "asset-specific" UCC financing statement against ICG with the New York Secretary of State, which was expressly limited to claiming a lien only on the "equipment" in Schedule No. 03. Unlike with Loan #1 and Loan #2, Plaintiffs did not file an all-asset financing statement in connection with the closing of Loan #3.

16. Plaintiffs' motion claims that that at some point between Mr. Korte's May 7, 2021 email and the closing on Loan #3, Plaintiffs' "loan committee" reneged on Mr. Korte's representations to me and Mr. Stein and then allegedly "communicated this verbally" to ICG. This is untrue. This was never communicated to me, or, on information and belief, to Mr. Stein. Had this been communicated to us, I never would have closed on Loan #3.

17. Meanwhile, ICG's business was starting to experience severe financial strain due to the effects of COVID-19 on its business, and ICG began looking for additional sources of funding to continue to retain employees and save its operations.

18. In November of 2021, ICG started the process of applying for a Federal Employee Retention Credit (the "ERC"), which ICG believed at the time would take

5

four to six months for the IRS to process and would result in a cash payment to ICG of $34 million or more. At the same time, ICG was approached by a new lender, FCS Advisors, LLC d/b/a Brevet Capital Advisors ("Brevet"), which offered to provide ICG a $25 million loan using the ERC as collateral.

19. In reliance on Plaintiffs' prior representations that they were not asserting an all-asset lien as to Loan #3, on or about December 20, 2021, ICG entered into a loan agreement with Brevet in which ICG specifically pledged the ERC to Brevet as collateral for a $25 million loan (the "Brevet Loan").

20. As part of the Brevet Loan, Brevet established a controlled "lockbox" account for receipt of any ERC distribution and filed special forms with the IRS directing the IRS to pay any ERC funds directly to Brevet's lockbox. In addition, on January 18, 2022, Brevet also filed a UCC financing statement expressly covering the ERC with the New York Secretary of State.

21. ICG spent the proceeds of the Brevet Loan largely to retain employees, but also to timely pay other creditors, including Plaintiffs, in order to try to salvage ICG's business.

22. Unfortunately, ICG has so far been unsuccessful in doing so, and is now, as mentioned above, down to six remaining employees and in a substantial amount of debt.

6

23.    In addition to Brevet, which is currently owed at least $28 million (and claims to be owed significantly more), ICG owes millions of dollars to other creditors.

24.    By way of example, ICG currently owes a substantial settlement sum to a plaintiff class of former employees that filed suit against ICG in the United States District Court for the Eastern District of Virginia, Case No. 3:22-cv-00034, and which is holding a confession of judgment against ICG for more than $2 million. On information and belief, those plaintiffs are also expecting to be paid from ERC funds, if and when the ERC funds are ever paid out by the IRS.

25.    ICG woefully underestimated the length and complexity of the ERC application process. As of today's date, the ERC still remains in the application process and under "examination" by the IRS.

26.    At the rate things are progressing with the IRS, I estimate that it will likely take at least another 9 to 12 months of ICG's continued cooperation with the IRS "examination" process before the IRS makes any decision on whether to fund the ERC and in what amount.

27.    I presume that if and when the IRS makes any payments, they will be made directly to Brevet's lockbox and not to ICG.  But in the event any ERC payments are received directly by ICG, the Brevet Loan agreement specifically

7

requires ICG to remit such payments to Brevet within three business days of ICG's receipt.

28.     As stated above, ICG has fully re-paid Plaintiffs' Loan #1 and Loan #2. Before it became financially unable to continue making the monthly "rental" payments on Loan #3, ICG also made re-payments to Plaintiffs on Loan #3 totaling more than $2.3 million.

29.     In spite of that, Plaintiffs currently claim to be entitled to an additional $5.2 million of payments from ICG (or from me individually as personal guarantor) on Plaintiffs' original $5 million loan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2023:

4865-4073-5313 v4 [104461-1]

8